## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GREGORY HIGGS,

               Plaintiff,

        v.

COLUMBIA UNIVERSITY,
JAMES CONLON, BRIAN
TESSEYMAN, TERRY BURDICK, and
JOHN MUROLO,

             Defendants.

**Case No.  05 Civ. 2642 (DF)**

**SECOND AMENDED COMPLAINT**

TRIAL BY JURY

## I.  NATURE OF CLAIM

1.   Plaintiff brings claims for race and color discrimination and retaliation with respect to harassment, a hostile work environment, salary and termination, pursuant to 42 U.S.C. §1981 ("Section 1981"), the New York State Human Rights Law, Executive Law §290 *et seq.* ("the State Human Rights Law") and the New York City Human Rights Law, §8-107 *et seq.* of the Administrative Code ("the City Human Rights Law").

2.   Plaintiff also asserts claims for breach of contract.

## II. JURISDICTION AND VENUE

3.   The jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

4.   All jurisdictional requisites have been satisfied.

1

5.   Plaintiff invokes the supplemental jurisdiction of this court to consider claims arising under state law.

6.   Venue lies in the Southern District of New York in that the events giving rise to this action occurred within the Southern District of New York.

### III.  THE PARTIES

7.   Plaintiff ("Plaintiff" or "Higgs") is an African-American male resident of New York County, State of New York.

8.   Defendant Columbia University ("Columbia University" or "the University") is a corporation licensed to do business in the State of New York, and is located at 116th Street, New York, New York 10025.

9.   Defendant James Conlon, a Caucasian male, was at all relevant times the Director of the Security Department of Columbia University ("the Security Department"), and is Caucasian.

10.  Defendant Brian Tesseyman, a Caucasian male, is a "Lieutenant" in the Security Department, which is a supervisory and managerial role.

11.  Terry Burdick, a Caucasian male, was at all relevant times, a "Sergeant" the Security Department, a managerial supervisory position.

12.  John Murolo, a Caucasian male, is the Security Department's Operations Manager.

### IV.  THE FACTS: THE RACIAL DISCRIMINATION

13.  Defendant Columbia University has a continuing pattern and practice of discriminating and harassing based on race, national origin and color and retaliating

2

against the minority employees of its Security Department.

14.  Within the Security Department there is a policy of discriminating against non-Caucasians, including Hispanics and African-Americans, in all terms and condition of employment including pay, benefits, promotions, training, discipline, termination and hostile work environment.

15.  Defendants also discriminate on the basis of color - the darker the color, the greater the discrimination.

16.  For example, Defendants discriminated against darker-skinned Hispanics, especially those with African ancestry, more so than lighter-skinned Hispanics.

17.  The University discriminates against minorities in its hiring and promotion practices and denies minority employees positions and levels of responsibility that are commensurate with their qualifications, experience and seniority.

18.  African-American employees, including Plaintiff, were and continue to be passed over for promotion in favor of lesser qualified Caucasian employees, or Caucasian individuals with lesser seniority and experience.

19.  As a result, almost all the non-management and non-supervisory employees of the University, including those in its Security Department, are Black and non-Caucasian  Hispanics.

20.  The management of the Security Department is composed solely of Caucasians with the sole exception of one Hispanic.

21.   Defendant Conlon at all relevant times was the Security Department's Director despite lacking the requisite qualifications and character.

22.   The University subjects its African-American employees to harsher

discipline and greater scrutiny than Caucasian employees.

23.  Defendants continuously racially harassed Plaintiff and other African American employees and continues to harass them.

24.  The use of derogatory racist terms, the posting of racially offensive posters and other racist conduct is common within the Security Department.

25.  Defendants also wrongfully denied Plaintiff and other African-American employees worker's compensation benefits in violation of the collective bargaining agreement ("the CBA") in place between Plaintiff's union, TWU Local No. 241 ("the Union") and the University.

26.  On September 10, 1996, Plaintiff was hired as a Security Officer in the University's Security Department and posted at the Health Sciences Campus.

27.  Higgs' supervisors were Defendants Conlon, Tesseyman and Burdick.

28.  Higgs' performance was excellent during his entire tenure at Columbia University.

29.  Plaintiff's qualifications and educational background were better and more extensive than most of his peers and supervisors in the Security Department.

30.  The University hired Higgs, in part, because of his extensive training and work experience as an EMT Specialist for the New York City Emergency Medical Service.

31.  Until his unlawful termination by the University, Higgs was studying literature and history at the University.

**The Racially Hostile Work Environment Within the Security Department.**

32.  Higgs' Caucasian supervisors, including Defendants Conlon, Burdick,

4

Tesseyman, racially harassed him throughout his employment.

33.  Plaintiff's Caucasian supervisors would usually speak to him in a condescending and incredibly aggressive and confrontational way and unjustly criticize him in front of his peers in an effort to undermine and humiliate Higgs.

34.  Higgs's supervisors would refer to Higgs and his black co-workers as "you people."

35.  Plaintiff's African-American co-workers were similarly harassed.

36.  Defendants did not harass similarly-situated Caucasians.

37.  Defendants would often make racist and racially offensive comments to Plaintiff and his minority co-workers.

38.   For example, around July 1996, Defendant Burdick posted racially offensive posters of "Buckwheat," a Black caricature, on the lockers of Black Security Officers.

39.    In reference to these posters, Burdick told several Black Officers, "This is how all black people look, with thick lips and nappy hair!"

40.  Burdick repeated these remarks on many occasions to the Black Officers despite the objections of the officers.

41.  In 1996, while an interracial couple walked by, Tesseyman stated to another Caucasian security officer that: "I really wish these Black guys would go back to Africa and leave our white girls alone."

42.  Tesseyman would often state to Plaintiff that black people like himself "always made things a racial issue."

43.  During 2000, Tesseyman repeated these comments stating, "All you people

ever do is complain that people are racist, like that asshole Al Sharpton!"

44.  During 1998, Mario Signori, a Caucasian security employee, told Higgs, "You Black people always complain about everything.  Why don't you be like the Chinese or Asians?  They don't complain about anything."

45.  In or around June 2005, Security Officer James Dooner, a Caucasian, called Security Officer Lewis Murray a "Little Nigger" in front of other minority Security Officers and supervisors.

46.  Murray declined to press charges against Dooner for fear of retaliation and because he was intimidated.

47.  A formal charge was filed, however, by other security officers who witnessed the incident.

48.  Defendants are aware of Officer Dooner's slur but he is still employed by the University.

49.   This is but one example of the fact that Defendants were well aware of the racially hostile work environment that was being perpetrated by the Caucasian managers of its Security Department and condoned it, refusing to discipline the offenders or take other remedial and preventative action.

50.  Defendants consistently passed over for promotion minority security employees in favor of lesser qualified and less senior Caucasians.

51.  For example, in 2001 Plaintiff applied for the position of Sergeant.

52.  Plaintiff was not even interviewed for the position despite being eminently suitable for the promotion.

53.  Defendant Conlon claimed that Higgs' application for the position had been

"misplaced."

54. On a few occasions, Sergeant Umpierre, a Black Hispanic male, and Sergeant Thelma Wilkerson, an African-American female, were passed over for promotion to the position of Lieutenant, despite superior qualifications and seniority.

55. Sergeant Mario Signori, a Caucasian male, who was promoted to the position of Lieutenant over both Umpierre and Wilkerson, was significantly less qualified and more junior.

56. Higgs also suffered harassment and was derided by his Caucasian co-workers and supervisors because he took advantage of the educational benefits offered by the University to all employees.

57. Defendants tried to deter Higgs from advancing his education and career.

58. Higgs enrolled in literature and history courses at the University's School of General Studies.

59. Higgs' Caucasian supervisors, including Defendant Conlon, would deride and belittle Plaintiff's efforts to further his education with condescending and threatening comments.

60. For example, Conlon regularly stated to Plaintiff, "Who do you think you are, trying to take classes here? You're not here to go to school. You are here to work and work only!"

61. In 2002, Defendant Conlon told Higgs that he did not "belong" in the University and that "You have no business sitting in a class with 18 year old girls! Their parents didn't send their 18 year old daughters to Columbia to meet a 40 year old Black security guard!"

7

62. Conlon added that Plaintiff was too old and was bound to fail his exams.

63. Conlon also said that if Higgs wanted to go to school, he would have to go to a school other than Columbia and that he could not both work and take classes at the University.

64. Conlon said this knowing that it was Higgs' right as a University employee to take classes at Columbia University.

65. Defendant Tesseyman similarly belittled Plaintiff.

66. For example, during Spring 2001, Tesseyman told Plaintiff, "I know that classes are included in your employee benefits but that's only on paper Higgs! You know as well as I do that if every one of *you people* decided to start taking classes, it would cost the university too much money! They're only written in the contract so that it would look good, but they don't really mean for you to use it!"

67. In or about February of 2001, Mario Signori, a "Lieutenant" in the Security Department, said to Plaintiff, "You should quit now Higgs because you're going to fail out anyway! You're not smart enough!"

68. In or about 2001, Defendant Burdick told Plaintiff: "So you're going to classes, huh. Well, don't ever let me catch you reading on post or I'll fucking write your ass up!"

69. In mid-November 2002, Ivan Arevalo, the University's Operations Manager for the Security Department, stated to Plaintiff: "Higgs, you're a fool if you think we're going to let you get a degree out of this place!"

70. The Caucasian Assistant Director of the Security Department, Janine Jeannette, who was hired in October 2002, also berated Plaintiff for taking classes.

8

71.  Jeanette falsely told Plaintiff that if he wanted to continue taking classes he had to leave his job in the Security Department.

72.  Plaintiff was warned by his African-American co-workers that he would face strong resistance and hostility from the Caucasian managers for taking classes.

73.  Thelma Wilkerson, a black supervisor within the Security Department, warned Higgs that he would be harassed for taking classes.  Ms. Wilkerson told Higgs that the Defendants did not like to see Black employees taking classes.

74.  Plaintiff's African-American and minority co-workers, including Danielle Cartwright, Jose Brens, Emilio Viccini, were subjected to extreme harassment for attempting to advance their education and promotional opportunities by taking courses at the University.

75.  In stark contrast, Caucasian employees who enrolled in courses at the University did not face this harassment and hostility.

76.  For example, Defendants Conlon and Murolo, who were improperly hired into senior management positions without the requisite university education, were encouraged by Defendants to take classes at Columbia University in order to attain the necessary qualifications.

77.  Upon information and belief, African-American employees were discouraged by their Caucasian supervisors from taking courses at the University to prevent their progress and prevent a more equitable race distribution among the University's management.

78.  Plaintiff and their African-American co-workers were subjected to other invidious forms of harassment.

9

79. Defendants refused to timely relieve Plaintiff at the end of his shift when he had to attend classes in an effort to interfere with his studies.

80. Also, Defendants assigned Higgs to another campus further away from where he attended lectures to interfere with his studies.

81. When Higgs complained of these incidents he was berated by Conlon.

82. Sergeant Paula Mann, a black co-worker, complained to Higgs of harassment that she had suffered at the hands of Defendant Burdick.

83. Defendant Burdick also sexually harassed Diane Valentine, a Hispanic facilities management cleaner, and again nothing was ever done to remedy this or provide Valentine with redress.

84. To date, the University has refused to take any disciplinary action against Burdick for these unlawful acts.

85. Defendant Burdick only sexually harassed minority employees of the University.

86. Defendant Burdick's racial and gender harassment, and sexual objectification of minority women, was notorious within the Security Department.

87. Defendant Burdick has been the subject of many complaints of sexual harassment from minority women throughout his employment.

88. Burdick claimed that he only dated minority women.

89. Defendant Burdick would often make derogatory comments, which were equally sexually and racially offensive.

90. Burdick would often make comments regarding Black women's "asses" and that he loves Black women's thick lips because "they give good head."

10

91.  On another occasion, Burdick was heard to say, again in reference to his sexual preference for minority women, "the darker the berry, the sweeter the juice."

92.  Defendant Burdick also told Angel Quiñones, a Hispanic Sergeant in the Security Department ("Quiñones") that: "God gave Black women big bootys so we can get fuck them in their asses!"

93.  This racially and sexually offensive manner of speech was commonplace within the Security Department.

94.  In or around 1999 or 2000, Sergeant Signori was overheard to state to William Bolger, who are both Caucasian, in reference to minority women, that "You're supposed to fuck them, not marry them! It's alright to fuck them but not to bring them home!"

95.  Sergeant Bolger was dating a Black woman when Signori stated this.

96.  The Caucasian supervisors, including Defendants Conlon, Tesseyman and Burdick, regularly referred to the African-American employees in front of Quiñones and other supervisors as "niggers."

97. Quiñones, who is a light-skinned Hispanic, was born in the United States and describes himself as looking "Italian," was promoted before Plaintiff, even though both were hired at the same time.

98.  Defendants Conlon and Tesseyman instructed Quiñones to target Higgs and write him up even for the most minor infractions.

99.  In fact, Defendants Burdick, Conlon and Tesseyman instructed Quiñones to manufacture or invent infractions in order to create a paper trail against Plaintiff and other minority security officers to justify their termination.

100.    Defendants Burdick, Conlon and Tesseyman told Quiñones, in reference to Plaintiff, that they had to "get that son of a bitch" and "get that fucking nigger out of here!"

101.    Such was the racially hostile work environment and the mistreatment of Plaintiff that Quiñones resigned his position in 2000.

102.    Quiñones cited the racism, harassment and bullying of the security employees by Defendants, in particular of Higgs and his African-American co-workers, as the reasons for his departure.

103.    The other acts of racism perpetrated by the University against Plaintiff and his co-workers, which created the racially hostile work environment, are too numerous to be fully listed here but include the following unlawful conduct.

104.    In 2002, Defendant Tesseyman referred to Security Officer Mark Bowen's children as "Little Monkeys."  Mark Bowen is African-American.

105.    In or about April 2003, Security Officer Pamela Davis, a Black woman, requested a day of leave to attend to her daughter who had just suffered a miscarriage.

106.    Defendants refused to allow Officer Davis a day off work.

107.    Because Officer Davis attended to her sick daughter, she was suspended for three days by Operations Manager Ivan Arevalo who told her, "Your daughter is an adult and didn't need you to be there to hold her hand."

108.    Similarly, in October 2002, Officer Mike Davis left work a mere hour before his shift had ended to attend to a medical emergency involving his ailing mother.

109.    In response, and despite knowing of the medical emergency, Defendants suspended Officer Mike Davis for four days for not completing his overtime and berated

him for leaving to attend to this sick mother.

110.     Defendants also berated and unfairly disciplined Plaintiff for missing work when he had to take his son to the emergency room during an asthma attack.

111.     Another instance of disparate treatment involved Security Officer Alan Larios, a Hispanic, and Security Officer Cal Vergano, a Caucasian.

112.     Both were assigned to take down the American and Columbia Flags but the Columbia Flag went missing.

113.     While both Vergano and Larios were suspended for five days for "misplacing property," Vergano was allowed to serve his suspension during his vacation and thus did not suffer any loss of pay.

114.     Larios on the other hand was forced to serve his suspension and suffered lost wages.

115.     Plaintiff's work proposals were routinely ignored and met with hostility.

116.     For example, in December 24, 1997, Higgs made proposals for improvements to the Security Department, including that the University provide the officers with sweaters during the winter months, that the University install chairs in the gate booths and that the University improve the workplace conditions, such as cleaner locker rooms and the installation of air conditioning.

117.     Higgs petitioned for racial sensitivity and leadership training for supervisors, addressing racial and sexual harassment in particular.

118.     Higgs also suggested improvements to security procedures at the University, such as modifying the card swipe procedures at the entrance points to the University.

13

119.     In response to these routine suggestions, Defendants harassed Plaintiff and scrutinized his every move.

120.     Defendants penalized Higgs for taking sick time or time off.

121.     Plaintiff was met with hostility on a daily basis and was constantly provoked.

122.     In contrast, Defendants encouraged Caucasian Officers to take initiative and propose improvements.

123.     Defendants often accepted proposals from Caucasian employees and rewarded their initiative with commendations and promotions.

124.     For example, Cal Vergano, a Caucasian officer, who had suggested such security measures as electronic alarm swipes, was promoted in or about 1998 to the position of Sergeant.

125.     African-American security officers are subjected to greater scrutiny and harsher discipline than their Caucasian counterparts.

126.     Caucasians in the Security Officers who are charged with serious misconduct are never suspended at the First Step of the union grievance process.

127.     For example, Defendant Burdick, Defendant Tesseyman, Dooner, and Defendant Murolo, were all adjudged to have committed gross acts of "serious misconduct" yet none were suspended at the First Step.

128.     Caucasians who had committed serious misconduct were only suspended after a lengthy investigation process and thus benefited from a full investigation.

129.     Moreover, Caucasian employees and supervisors of the Security Department were often shielded from being formally charged and investigated for serious

14

misconduct and would instead receive informal warnings or no warnings at all.

130.   Caucasian employees and supervisors who did receive suspensions were usually allowed to serve the terms of suspension at their own discretion that would entail minimal loss of wages, including Defendant Burdick and Security Officer Dooner.

131.   Caucasians were given lesser terms of suspension.

132.   Security Officer Cal Vergano was even allowed to serve his period of suspension concurrently with his vacation time.

133.   Defendants therefore shield their Caucasian employees from experiencing a loss of pay.

134.   In stark contrast, Black employees were routinely suspended at the First Step of the grievance process after being charged with misconduct before any investigation process.

135.   Minority security employees could not serve their terms of suspension at their discretion and thus suffered the most severe financial penalties and loss of pay.

136.   Almost every alleged infraction committed by a black security officer would result in a suspension as opposed to a warning or other lesser discipline.

137.   Defendants would routinely charge Black security employees with "misconduct" or "serious misconduct" for relatively minor infractions.

138.   For example, as stated below, Plaintiff was improperly charged with "serious misconduct" for rushing to the aid of a physician during a medical emergency.

139.   In or about February 2000, Danielle Cartwright, an African-American security officer, was charged with "serious misconduct" and immediately suspended for three months without pay for allegedly allowing a food deliveryman to enter a University

dorm to deliver a food order.

140.    Such an infraction at worst is merely a failure to follow correct procedure and should not have resulted in a suspension.

141.    A Caucasian security employee would not have been suspended under these circumstances.

### Plaintiff and the Minority Security Employees Complained Constantly of the Discrimination and the Harassment, and Defendants Retaliated.

142.    Because of the constant harassment, Higgs began to suffer physically and emotionally.

143.    Plaintiff complained to management about the discriminatory treatment and also filed union grievances.

144.    Plaintiff was retaliated against after complaining.

145.    For example, soon after complaining of discrimination and grieving his wrongful termination, on January 23, 2003, Defendants attempted to pressure Higgs into accepting a lower paying job as a janitor/heavy cleaner in another department with the University.

146.    This position entailed a much lower salary, less educational benefits, fewer opportunities for advancement and fewer employment benefits.

147.    Defendants told Plaintiff that if he did not accept this new position he would lose his job, benefits and apartment within the University's grounds.

148.    Plaintiff refused to accept this position.

149.    Despite this retaliatory action, Higgs continued to use the University's

150.    internal complaints mechanisms.

16

151.    Thus, Higgs complained on numerous occasions, orally and in writing, regarding the racial harassment and discrimination that he and his co-workers were suffering to the University's Ombudsman Marsha Wagner, the University's President Lee Bollinger and the Assistant Vice-Presidents of Facilities Management.

152.    In or about Spring of 2001, Plaintiff complained of racial discrimination and harassment to Dr. Gerald Fischbach, the University's President of the Health Sciences Campus.

153.    In July, 2001, Dr. Fishbach's Assistant Vice President, Kevin Kirby, coordinated with Wagner and convened a meeting in order to address the complaints of discrimination from the African-American security officers.

154.    At this meeting, Kirby stated that the complaints of racism and discrimination were valid, adding that the minority employees should not have to work under such conditions nor fear retaliation.

155.    Kirby promised to bring these concerns to Senior Director of the Security Department, Dr. Gerald Fischbach.

156.    Despite these concessions and promises, the University failed to address and prevent the racial harassment, discrimination, and retaliation, which continue to this day.

157.    At various times during Plaintiff's employment, including during Spring of 2001, Spring of 2002, and Fall of 2002, and most recently in 2004, Plaintiff submitted to Wagner written poll**s** by the African-American security employees grieving the racial discrimination, harassment and retaliation that they were all suffering.

158.    Higgs also submitted to Wagner complaints of sexual harassment on

17

behalf of African-American co-workers.

159.    Higgs submitted another consensus poll from the minority Security

Officers in Spring of 2003, which collectively highlighted the racial discrimination,

harassment and retaliation that was rife within the Security Department.

160.    Furthermore, during a meeting on or about May 18th 2003 with the

University's higher management, in excess of fifty security officers voiced their

complaints of the racial and sexual harassment by the management of the Security

Department.

161.    The University refused to address and remedy the discrimination.

162.    Instead, as stated below, the University retaliated against Plaintiff, which

culminated in his unlawful dismissal.

163.    Plaintiff's African-American co-workers also complained to their

supervisors and the University's upper management of the harassment and discrimination

and filed charges of discrimination.

164.    These African-American co-workers suffered severe reprisals for

complaining.

165.    Upon information and belief, many of the minority employees of the

Security Department who have filed administrative discrimination complaints and

charges have been fired or forced out of their employment, including Plaintiff and

John Greene, a former Black co-worker.

166.    African-American supervisors who attempted to address the racially

hostile work environment within the University were retaliated against and soon lost their

positions.

18

167.     For example, John Fields, an African-American Assistant Director of Security, conducted an investigation into Defendant Burdick's misuse of a department patrol car for his own personal errands.

168.     In retaliation, Conlon fired Fields in 1998, weeks after hiring him, falsely claiming lack of funds as the reason.

169.     In or around April 2001, Creola Griffin, an African-American, was hired as the new Assistant Director of the Health Sciences Security.

170.     Griffin immediately initiated changes in the Security Department to improve the morale and address the grievances and complaints of racial discrimination.

171.     These measures were aimed at eliminating the discriminatory punitive discipline faced by minority employees and being more responsive to their concerns.

172.     In contrast to the Department's Caucasian managers, Griffin actually responded to the complaints of discrimination by investigating them and then, if necessary, recommending appropriate action.

173.     Griffin refused to bow to pressure from Conlon, who wanted her to unjustly terminate the employment of an African-American security employee.

174.     In retaliation for refusing to terminate the Black employee's employment, Conlon suspended Griffin.

175.     Upon information and belief, Griffin then accepted a severance package and left the University.

176.     The University's action against Griffin was part of Defendants' pattern and practice against Black employees who were hired or promoted to a supervisory level.

177.     As a consequence, there are no African-Americans in the Security

19

Department's management.

178.    Defendants similarly retaliated against Plaintiff for complaining of the discrimination that he and his co-workers were facing.

179.    Higgs' suspension on August 6, 2000 was retaliatory and on false grounds.

180.    The University suspended Higgs for "conduct unbecoming" which was completely unfounded.

181.    The incident in question involved a disagreement between Plaintiff and an independent vendor, who worked off the University Campus, and had sold Plaintiff spoiled grape juice.

182.    The University seized upon this routine disagreement that was completely unrelated to Higgs' work to suspend his employment.

183.    On February 15, 2002, Plaintiff was injured at work when the chair in which he sat suddenly collapsed, causing him to fall backward and hit his head on the marble floor.

184.    Higgs was taken to hospital and received treatment for his injuries.

185.    After being discharged, Higgs asked Defendant Tesseyman if he could leave work and go home.

186.    In response, Tesseyman began to yell at Higgs, threatened him with physical violence and claimed that Higgs had feigned his injuries.

187.    Higgs complained of this mistreatment to the University.

188.    In retaliation for this complaint, Plaintiff suffered further harassment and hostility.

189.    For example, Plaintiff was required to meet with Murolo ostensibly

to discuss his complaints against Tesseyman.

190.    During this meeting, Murolo yelled at Plaintiff, while pointing his finger in his face, "Who do you think you are going outside of the Department to complain!"

191.    During this meeting, Plaintiff was subjected to an exhaustive and punitive interrogation lasting over an hour during which Murolo repeatedly taunted and berated Plaintiff.

192.    Plaintiff had objected to meeting with Murolo because Plaintiff had previously also filed charges of harassment against Murolo personally when Murolo called Higgs into his office to harass him for his filing union grievances.

193.    Again, on April 15, 2002, another supervisor, Elizabeth Compel, attempted to intimidate Plaintiff into dropping his complaint against Tesseyman.

194.    Predictably, the University refused to address Plaintiff's complaint and neither Tesseyman, Murolo nor Compel were disciplined for harassing him.

195.     On April 29, 2002, Plaintiff was injured while arresting an intruder who attempted an illegal entry into the Hammer Library Building.

196.    Defendant Conlon falsely accused Plaintiff of violating proper procedure in detaining the intruder and denied Plaintiff proper compensation benefits.

197.    The University gave Caucasians who were injured at work the requisite support.

198.    For example, when Caucasian Security Officer Brian Richards was injured after falling off a defective chair, Conlon apologized to Security Officer Richards for his injury and allowed  him to take extended medical leave to recuperate.

199.    Finally, in 2002, Because Defendants completely refused to address

21

Higgs' complaints of discrimination over a seven year period and instead retaliated against him, Plaintiff filed a formal complaint of discrimination with the University's Equal Opportunity and Affirmative Action office ("EOAA") and also with the EEOC's New York District  Office in 2002.

200.    On December 5, 2002, Plaintiff agreed to release his discrimination claims, including his discrimination charge with the EEOC, in return for a promise by the Defendants to pay Higgs his worker's compensation benefits, pay him back pay and provide him with re-training.

201.    In fact, Defendants breached the settlement agreement, including by refusing to pay Plaintiff the agreed upon money for his injuries and refusing to retrain Higgs.

202.    On December 6, 2002, and despite the settlement agreement reached the day before, Defendant Conlon subjected Plaintiff to extreme harassment during two meetings.

203.    During these meetings, Conlon berated Higgs for his complaints and tried to provoke and intimidate Higgs into resigning.

204.    Plaintiff refused to resign.

205.    On December 7, 2002, Plaintiff immediately responded to an urgent request for assistance from Dr. Christine Frissora, an affiliated Columbia University physician, during a life-threatening medical emergency involving Dr. Steven Samuels.

206.    Dr. Samuels, a visiting Columbia University physician, had collapsed from an apparent heart attack.

207.    Dr. Frissora ran to Plaintiff's post and requested his assistance.

22

208.    Dr. Frissora told Higgs that she thought that Dr. Samuels had suffered a heart attack.

209.    At the scene, Plaintiff helped to stabilize Dr. Samuels and guided him to a stretcher.

210.    **In response to this incident, Defendant Tesseyman unlawfully suspended Plaintiff, falsely claiming, *inter alia,* that Plaintiff had abandoned his post when responding to the medical emergency, had failed to notify his superiors of a serious medical emergency and had "touched an injured or sick person."  (amend)**

211.    After unlawfully suspending Plaintiff, Tesseyman followed Plaintiff into the corridor outside his office, and in full view of security employees, shouted, "I'm sick of your shit!  You are going to do as I say!" while pointing his finger in Higgs' face.

212.    Defendants denied Higgs' union representation when they suspended him and even tried to prevent Higgs from communicating with his union shop steward.

213.    Moreover, Defendants prevented Plaintiff's union representative from obtaining further particulars regarding his suspension.

214.    Defendants also continued to harass Higgs, including calling him at home incessantly.

215.    Plaintiff and his union grieved his suspension.

216.    Caucasian officers who gave such emergency assistance in the past were never disciplined.

217.    For example, in or about May, 2000, Gerald Goldstein, a Caucasian Security Officer, physically aided an injured person, yet he was not disciplined or written up.

23

218.   On December 9, 2002, Operations Manager Ivan Arevalo, who had also harassed Plaintiff at the December 6th hearing, upheld Plaintiff's suspension.

219.   On December 10th, 2002, Higgs attended a 3rd Step hearing before Sheila Garvey, the Manager of Defendants' Employee and Labor Relations Department, and Defendant Conlon and Janine Jeanette.

220.   Garvey upheld the prior disciplinary action against Higgs.

221.   On December 12, 2002, Defendants unlawfully terminated Plaintiff's employment.

222.   The false claims leveled against Plaintiff as a basis for his termination included "insubordination", "abandoning his post" and "failing to notify the base of a serious medical emergency."

223.   Plaintiff's union grieved his unlawful termination.

224.   During the arbitration held in 2003, on the issue of Plaintiff's unlawful termination, Defendant Conlon threatened and intimidated witnesses who had been called by Higgs' union to testify against the University.

225.   In fact, Security Officer Gerald Goldstein left the hearing without providing testimony after Conlon threatened him with termination and other discipline if he testified against him and the Defendants.

226.   Defendants have continued to retaliate and discriminate against Plaintiff after his termination.

227.   For example, as a consequence of Defendants' representations, the Unemployment Division disqualified Plaintiff from receiving unemployment benefits, further adding to his emotional and financial burden.

24

228.    Plaintiff appealed the decision and testified before the Unemployment Insurance Appeal Board.

229.    Upon hearing testimony from all the parties, the Unemployment Insurance Appeal Board overturned its prior decision and granted Plaintiff full unemployment benefits ruling that: "The credible evidence establishes that the claimant [Plaintiff] left his post to respond to a crisis situation and he was following the instructions of the doctors on the scene.  The claimant radioed base twice during the crisis and base was informed of the situation. Under these circumstances, I conclude that the claimant's actions do not constitute misconduct."

230.    Defendants have attempted to preclude Plaintiff from access to the University campus to study and take his final exams.

231.    On December 15, 2002, Signori called Plaintiff at home to advise Plaintiff that he could not use the University library anymore.

232.    Plaintiff told Signori that he needed access to the library to prepare for his final exam the following day.

233.    In response, Signori stated that Higgs was "persona non grata" and falsely claimed that Higgs was not allowed anywhere near the University campus.

234.    In fact, during this time the status of Plaintiff' education was within the sole purview of the Dean of the School of General Studies.

235.    Defendants have since prevented Plaintiff from continuing his higher education at Columbia University.

236.    Defendants have also secured Higgs' eviction from University housing.

237.    Defendants have prevented Plaintiff from obtaining comparable

alternative employment by providing misleading, biased and/or false references to prospective employers regarding Plaintiff's employment and the reasons for his separation.

238.    For example, on or about November 19, 2003, and again on or about April 12, 2004, Defendants Conlon and Burdick made false negative statements about Plaintiff's work history to prospective employers and made disparaging statements about Plaintiff's character.

239.    Defendants' actions were intentional and were motivated by discrimination based on race and in retaliation for Plaintiff's protected activity.

240.    Defendants' actions were part of the corporate-wide and department wide pattern and practice and policy of discrimination against minorities, in particular, African-Americans, in all terms and conditions of employment, including pay, promotions, termination and hostile work environment.

## V.  THE CAUSES OF ACTION

### FIRST CAUSE OF ACTION: SECTION 1981

241.    The allegations of the preceding paragraphs are repeated here as fully stated.

242.    Plaintiff brings his claims against all Defendants.

243.     By their actions, Defendants retaliated against and discriminated against Plaintiff with respect to hostile work environment, wages, hiring, termination and other terms and conditions of employment because of Plaintiff's race, ethnicity, and color in ]violation of 42 U.S.C. §1981.

244.     By their actions stated herein, Defendants have caused Plaintiff great pain and suffering and damaged him in an amount as yet undetermined.

## SECOND CAUSE OF ACTION:
## NEW YORK STATE HUMAN RIGHTS LAW (RACE)

245.     The allegations of the preceding paragraphs are repeated here as fully stated.

246.     Plaintiff has been discriminated against because of his race, ethnicity and/or color as described hereinabove.

247.     By their actions, Defendants discriminated and retaliated against Plaintiff with respect to hostile work environment, wages, hiring, termination, and other terms and conditions of employment, because of his race, ethnicity, national origin and color in violation of the New York State Human Rights Law.

248.     The individually named Defendants also aided and abetted the discrimination and Defendant Conlon personally made the decision to terminated Plaintiff's employment.

249.     By their actions stated herein above, Defendants caused Plaintiff great pain and suffering and damaged him in an amount as yet undetermined.

## THIRD CAUSE OF ACTION:
## NEW YORK CITY HUMAN RIGHTS LAW (RACE)

250.     The allegations of the preceding paragraphs are repeated here as fully stated.

251.     By their actions, Defendants and their agents retaliated against and

discriminated against Plaintiff with respect to hostile work environment, wages, hiring,

termination, and other terms and conditions of employment because of his race, ethnicity,

national origin and color in violation of the New York City Human Rights Law.

252.    The individually named Defendants also aided and abetted the

discrimination and retaliation.

253.    By their actions stated herein above, Defendants caused Plaintiff great

pain and suffering and damaged them in an amount as yet undetermined.


### FOURTH CAUSE OF ACTION:
### BREACH OF CONTRACT

254.    Defendant Columbia University breached the agreement dated December

5, 2002 with Plaintiff.

255.    In the agreement Defendant Columbia undertook to provide Plaintiff with,

*inter alia*, back pay, workers compensation, reinstatement, formal training and other

relief.

256.    Defendant failed to provide Plaintiff with any of the relief it promised in

the December 5, 2002 agreement.

257.    Defendant's breach of contract has caused Plaintiff economic damages.

258.    In breaching the contract, Plaintiff is entitled to have it rescinded and to

obtain damages.


**WHEREFORE,** Plaintiff prays for judgment against the Defendants as follows:

a)      Granting declaratory relief finding that the practices complained of

herein are illegal, injunctive relief to correct the illegal practices complained of herein,

28

including reinstatement of Plaintiff with full seniority, and benefits and monetary

damages;

        b)      Costs, disbursements and attorneys fees; and

        c)      Such other and further relief as this Court deems just and proper.

## VI.
## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:      New York, New York
             October 17, 2007

By: _____
LOCKSLEY O. WADE, ESQ.
LAW OFFICE OF LOCKSLEY O. WADE, LLC
15  W. 39th Street, 3rd Floor
New York, New York 10018
(212) 220-3610
(212) 253-4142 – Facsimile
lwade@lwade-law.com